UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRENDA KAVA, and BRADLEY
KAVA,

    Plaintiffs,

File No. 1:07-CV-507

v.

HON. ROBERT HOLMES BELL

JAMES P. VAN WAGNER, D.O., et al.,

    Defendants.
_____/

# **O P I N I O N**

This is a medical malpractice action brought by Plaintiffs Brenda and Bradley Kava against Defendants James P. Van Wagner, D.O., MVP Orthopedics & Sports Medicine ("MVP"), and Michael J. Peters, II, D.O. Plaintiffs have settled their claims against Defendants Van Wagner and MVP. This matter is before the Court on a motion for summary judgment filed by Defendant Peters. (Dkt. No. 124.) Subsequent to filing his motion, Defendant Peters filed supplemental briefing regarding additional case law to which Plaintiffs have responded. (Dkt. Nos. 139, 141.) Plaintiffs also move to file a supplemental brief and supplemental affidavit. (Dkt. No. 171.) Defendant objects to the supplemental brief and moves to strike the supplemental affidavit. (Dkt. No. 177.) Finally, Plaintiffs have filed a motion for leave to file an amended notice of intent. (Dkt. No. 160.) The Court heard oral argument on the pending motions on August 24, 2009. For the reasons that follow, Defendant's motion for summary judgment will be granted.

# I.

Plaintiffs are residents of Mississippi. According to Plaintiffs, in August and September of 2005 Plaintiff Brenda Kava[1] dislocated her left shoulder on several occasions. Plaintiff traveled to Traverse City, Michigan, and checked into a hospital emergency room to obtain x-rays of her shoulder on September 4, 2005. She was referred to Defendant James P. Van Wagner, D.O. On September 12, 2005, Dr. Van Wagner performed shoulder reconstruction surgery on Plaintiff. At a follow-up appointment with Dr. Van Wagner one week later, Plaintiff indicated that she was still in great pain. On September 27, 2005, Plaintiff went to the emergency room because she had a fever and was coughing up blood. She was admitted to the hospital that day and was not released until September 30, 2005. Plaintiff's Internist, Dr. Mary Clifton, saw Plaintiff several times while she was in the hospital, and again on October 7, 2005, as Plaintiff continued to complain of pain in her shoulder. Between October 9 and October 18, 2005, Plaintiff attempted in vain to obtain an appointment with Dr. Van Wagner that was earlier than her scheduled follow-up appointment, so Plaintiff obtained a referral to Defendant Michael J. Peters, II, D.O. Dr. Peters saw Plaintiff on October 19, 2005, and reviewed x-rays of Plaintiff's shoulder. He prescribed pain medication and physical therapy and told Plaintiff to return in a month. Continuing to experience pain in her shoulder, Plaintiff saw Dr. Peters again on November 10, 2005; he scheduled an MRI of her shoulder for November 23, 2005. Because of her

---

[1]Unless otherwise indicated, references to "Plaintiff" are to Brenda Kava.

continuing shoulder pain, on November 22, 2005, Plaintiff's physical therapist contacted Dr. Peters's office. A physician at Dr. Peters's office ordered an immediate MRI. The next day, Plaintiff saw Dr. Clifton, who informed Plaintiff that her shoulder was infected and that the infection had spread to the bone. Plaintiff subsequently underwent a course of antibiotics and several surgeries to treat the infection and to replace the part of the shoulder joint that had been irreversibly damaged by the infection.

Plaintiffs contend that Dr. Peters did not properly diagnose, or order tests to diagnose, the postoperative infection in Plaintiff's shoulder when he saw Plaintiff on October 19 and November 10, 2005, and that his actions constituted medical malpractice that caused permanent damage to her shoulder.[2] Plaintiff seeks damages for "pain and suffering, disability and disfigurement, mental anguish, denial of social pleasure and enjoyments, incurred medical and hospital expenses and a permanent impairment of . . . earning capacity." (Dkt. No. 1, Compl. ¶ 29.) Her husband, Bradley Kava, seeks damages for loss of consortium. Plaintiffs concede that any damages sustained by Plaintiffs prior to October 19, 2005, the date that Defendant Peters first saw Plaintiff, are not attributable to Defendant Peters. (Dkt. No. 128, Pls.' Answer in Opp'n to Mot. for Summ. J. 2.) Thus, at a minimum, Defendant is entitled to summary judgment with respect to any claimed injury or damages sustained by Plaintiff prior to October 19, 2005.

---

[2]Plaintiffs' complaint also asserts that Defendant Peters did not properly aspirate the shoulder, but Plaintiffs have since withdrawn this claim. (Dkt. No. 128, Pl.'s Answer in Opp'n to Mot. for Summ. J. ¶¶ 5, 6.)

**II.**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita*, 475 U.S. at 587). However, the Court must view the facts in the light most favorable to the nonmoving party only when there is a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The mere existence of a scintilla of evidence is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

**III.**

Under Michigan law, a plaintiff bringing a cause of action for medical malpractice must establish the following elements:

> (1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care.

*Craig ex rel. Craig v. Oakwood Hosp.*, 684 N.W.2d 296, 308 (Mich. 2004). Defendant argues that Plaintiffs cannot establish causation or damages. "'Proximate cause'" is a legal term of art that incorporates both cause in fact and legal (or 'proximate') cause." *Id.* at 309. "[A] plaintiff cannot satisfy this burden [of establishing proximate cause] by showing only that the defendant *may have* caused his injuries." *Id.* (emphasis added). A plaintiff must show "more than a mere possibility or a plausible explanation." *Id.*

Medical malpractice actions in Michigan are subject to the causation statute, Mich. Comp. Laws § 600.2912a, which provides, in relevant part:

> In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that *more probably than not* was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for *loss of an opportunity* to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.

Mich. Comp. Laws § 600.2912a(2) (West 2009) (emphasis added). This section sets forth the standards for causation for a "traditional" claim of medical malpractice and for a claim of lost "opportunity to achieve a better result." The application of this section has been the subject of much debate and confusion amongst the courts. *See Compton v. Pass*, No. 260362, 2009 WL 563952, at *5 (Mich. Ct. App. Mar. 5, 2009) (noting the confusion).[3] A

---

[3] Defendant argues that the "lost opportunity" standard set forth in the second sentence of § 2912a(2) is governed by the interpretation given by the Michigan Court of Appeals in *Fulton v. William Beaumont Hospital*, 655 N.W.2d 569 (Mich. Ct. App. 2002). According to *Fulton*, a plaintiff pursuing a lost opportunity claim must show that the defendant's negligence reduced plaintiff's opportunity for a better result such that the reduction exceeds fifty percent. *Id.* at 575. In the Michigan Supreme Court's opinion in *Stone v. Williamson*, 753 N.W.2d 106 (Mich. 2008),
(continued...)

5

traditional claim of medical malpractice is one where the defendant's negligence was, more likely than not, the cause of a physical injury. In contrast, a "lost opportunity" claim allows a plaintiff to bring a cause of action where the plaintiff may not be able to show that the defendant's negligence was, more likely than not, the cause of the physical injury, because the injury "might have occurred anyway[.]" *Stone v. Williamson*, 753 N.W.2d 106, 113 (Mich. 2008) (Taylor, C.J.). Nevertheless, "the defendant's act or omission hastened or worsened [the injury] in such a way that the plaintiff suffered more . . . than he or she would have had the negligence not occurred." *Id.*

In *Stone*, the Michigan Supreme Court analyzed a claim that the defendants' failure to properly diagnose the plaintiff's condition, an abdominal aortic aneurysm, allowed the aneurysm to rupture, which required emergency surgery and lead to the amputation of plaintiff's legs. 753 NW.2d at 108. Six out of the seven justices agreed that the plaintiff's case involved a traditional claim of medical malpractice rather than a "lost opportunity"

---

[3](...continued)
all seven justices believed that "*Fulton*'s analysis is incorrect or should be found to no longer be good law . . . ." *Id.* at 164. Defendant argues that *Fulton* is still good law because the discussion of *Fulton* in *Stone* is dicta. *See Velez v. Tuma*, 283 Mich. App. 396, 2009 WL 1034266, at *3 (Mich. Ct. App. Apr. 16, 2009); *Compton*, 2009 WL 563952, at *5. Plaintiffs argue that the lost opportunity standard in *Fulton* is no longer good law after *Stone*. Because this is a diversity case, the Court must "apply state law in accordance with the controlling decisions of the state supreme court. If the state supreme court has not yet addressed the issue presented, [the Court] must predict how the court would rule by looking to all the available data." *Allstate Ins. Co. v. Thrifty Rent-A-Car Systems, Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (citations omitted). "Intermediate state appellate courts' decisions are . . . viewed as persuasive unless it is shown that the state's highest court would decide the issue differently." *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005). The *dicta* in *Stone* provides a strong indication that the Michigan Supreme Court would interpret the lost opportunity standard in § 2912a(2) differently than the court in *Fulton*.

claim because the jury instructions and evidence at trial supported a traditional claim. *Id.* at 116.

After *Stone*, the Michigan Court of Appeals analyzed a claim that the defendant failed to properly diagnose a vascular condition, which resulted in the plaintiff having her leg amputated. *Velez v. Tuma*, 283 Mich. App. 396, 2009 WL 1034266, at *1 (Mich. Ct. App. Apr. 16, 2009). The court determined that the case was factually similar to *Stone*, and did not involve a "lost opportunity" claim because the plaintiff specifically claimed that the defendant's negligence was the proximate cause of a physical injury, the loss of the plaintiff's leg. *Id.* at *5. *But see Klein v. Kik*, 692 N.W.2d 854, 856-57 (Mich. Ct. App. 2005) (looking past the pleadings to construe the "gravamen" of the claim).

Plaintiffs appear to be conflicted as to which type of claim they are pursuing. In their response to the motion for summary judgment, Plaintiffs offer the testimony of their experts purporting to show that Defendant's negligence resulted in a loss of opportunity for a "better outcome." In response to one of Defendant's motions, Plaintiffs assert that they are not pursuing a lost opportunity claim; rather, they claim to seek damages for a physical injury caused by Defendant's negligence. (Dkt. No. 141, Pls.' Resp. to Defs.' Supplemental Citations 3-4.) They describe the injury as "severe damage to the articular cartilage and . . . to the bone of the joint leading to permanent damage to that joint." (*Id.*; Compl. ¶ 28.) Regardless of whether the Court construes Plaintiffs' claim as a traditional claim or as a lost opportunity claim, it fails as a matter of law.

7

Expert testimony is essential to establishing the element of causation in a medical malpractice action. *See Teal v. Prasad*, --- N.W.2d ---, 283 Mich. App. 384, 2009 WL 1011705, at *5 (Mich. Ct. App. 2009) (noting that "[e]xpert testimony is generally required in medical-malpractice cases."). Plaintiffs retained orthopedic surgery expert, Dr. Lawrence Kriegshauser, to testify regarding causation. Dr. Kriegshauser testified that he believed that Plaintiff's shoulder joint was infected on October 19, 2005, and that this infection began some time prior to that date. (Dkt. No. 124, Def.'s Mot. for Summ. J., Ex. D, Kriegshauser Dep. 56.) He also testified that damage to cartilage can occur as early as twenty-four hours after infection, but "most of the time" there is a window of opportunity of a few days where, before there is significant damage to the cartilage, the infection can be treated and the joint can be salvaged. (*Id.* at 57.) As the infection progresses, however, there comes a "point of no return" after which the joint cannot be salvaged. (*Id.* at 58.) Yet Dr. Kriegshauser repeatedly testified that he could not say whether Plaintiff's shoulder was salvageable as of October 19, 2005:

> Q. Do you have an opinion as to whether it's possible that by October 19th, 2005, Mrs. Kava was at [the point of no return]?
>
> A. I really don't know. I don't know if anybody could honestly say that unless they had gone in on that date to operate and debride it and describe the joint or if you had an MRI from that date. . . . given the history, her pain, the x-rays, everything . . . I definitely feel her joint was infected then. Whether it was salvageable at that time I really don't know.
>
> Q. Is it possible that it was not?
>
> A. Sure. I mean, as they always say in medicine, anything is possible, but I can't give

> you an honest percentage if treatment had begun on the 19th what the chance it would be that she'd have ended up with a functional shoulder.

(*Id.* at 58.) He also testified that, regardless of whether Plaintiff had been properly diagnosed and treated on October 19, 2005, she would have had some "permanent morbidity" or "permanent problems" with her shoulder. (*Id.* at 59.) He could not, however, give a percentage chance of a better outcome, and could not state, more probably than not, that the shoulder replacement surgery could have been prevented if Plaintiff had been treated on October 19, 2005. (*Id.* at 59-60.) Finally, Dr. Kriegshauser testified that, had Plaintiff been treated on October 19, 2005, "it would be more likely than not she would have statistically had a better chance of having a better outcome because . . . the sooner we treat infections generally the better result." (*Id.* at 68.) On further questioning, he stated that, although he could not state that it was more likely than not that Plaintiff would not have needed a shoulder replacement if she had been properly treated, he believed it was more likely than not that she would have had a "better outcome." (*Id.* at 69.) He did not indicate what that "better outcome" might have been.

In response to Defendant's motion, Plaintiffs have also offered an affidavit from Plaintiff's surgeon and treating physician, Dr. Donnis K. Harrison, who states that the failure to diagnose the infection on October 19, 2005, "decreased Brenda Kava's opportunity for some better outcome by greater than 50 percentage points" and that, had the infection been diagnosed by Defendant Peters, "it is more likely than not that Brenda Kava would have

achieved a better outcome."[4] (Dkt. No. 128, Pls.' Answer in Opp'n to Mot. for Summ. J., Ex. 1, Harrison Aff. ¶¶ 7,8.) Like Dr. Kriegshauser, Dr. Harrison does not indicate what the "better outcome" might have been.[5]

Less than a week before oral argument, Plaintiffs submitted an affidavit of Dr. Kriegshauser which asserted that "it is more likely than not, that if Dr. Peters had diagnosed and aggressively treated [Plaintiff's shoulder infection] on October 19, 2005, [Plaintiff] would not thereafter have required that the humeral cup of her shoulder be surgically replaced." (Dkt. No. 171, Ex. 2, Kriegshauser Aff. ¶ 7.) Defendant objected to the timeliness of this affidavit, and at oral argument Plaintiffs withdrew it from consideration. Even if Plaintiffs had not withdrawn it from consideration, it would not be considered by this Court because it contradicts Dr. Kriegshauser's repeated deposition testimony that he could not state that, more likely than not, Plaintiff would not have required shoulder replacement surgery in the absence of Defendant's negligence. "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts

---

[4]Defendant argues that this affidavit should not be considered because it is untimely (provided after discovery and after the motion for summary judgment was filed), and because Plaintiffs allegedly asserted in their responses to discovery requests that Dr. Harrison would testify only as a treater, not as an expert on causation. The Court declines to address these issues because Dr. Harrison's affidavit does not materially add to Plaintiffs' evidence.

[5]Dr. Harrison's statement regarding a "better outcome" is at least partially inapplicable to Plaintiffs' claim against Defendant Peters. Dr. Harrison states that the failure to diagnose the infection "on October 19, 2005 *and the two weeks leading up to that time* decreased [Plaintiff's] opportunity for a better outcome . . . ." (Harrison Aff. ¶ 7.) (emphasis added). However, any harm resulting from failure to diagnose Plaintiff during the two weeks before October 19, 2005, cannot be attributed to Defendant Peters.

her earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (quoted in *Briggs v. Potter*, 463 F.3d 507, 512-13 (6th Cir. 2006)).

Plaintiffs seek relief for, among other things, medical and hospital expenses related to treatment of Plaintiff's shoulder. (Compl. ¶ 29.) Dr. Kriegshauser conceded that, even if Defendant had properly diagnosed and treated Plaintiff's shoulder infection on October 19, 2005, Plaintiff would have incurred medical expenses for antibiotics, surgical treatment of the infection, a hospital stay, home nursing care, and physical therapy. (Kriegshauser Dep. 61-62.) Dr. Kriegshauser also conceded that Plaintiff would have had scarring due to the presence of scarring from previous shoulder surgeries. (*Id.* at 62.) Plaintiffs do not challenge this testimony or attempt to show a connection between any of Plaintiffs' medical expenses, or any other damages, and Defendant's alleged negligence.

In summary, the uncontroverted evidence available to the Court indicates that, even if Plaintiff had received treatment beginning on October 19, 2005, Plaintiff's shoulder would have sustained some permanent damage. Assuming that Defendant's alleged negligence was the proximate cause of some additional damage, there is no evidence that Defendant's negligence was the proximate cause of damage necessitating shoulder replacement surgery. Plaintiffs' expert on causation, Dr. Kriegshauser, repeatedly testified that he could not opine that, more likely than not, Plaintiff could have avoided shoulder replacement surgery in the absence of Defendant's negligence, and neither of Plaintiffs' experts asserted that Defendant's negligence caused a loss of opportunity to avoid shoulder replacement surgery.

11

Thus, Defendant is also entitled to summary judgment with respect to all of Plaintiff's claimed damages arising out of her shoulder replacement surgery. The question, then, is whether Plaintiffs' evidence supports a claim for any other damages.

At best, Plaintiffs' evidence indicates that Defendant's negligence prevented Plaintiff from obtaining, or caused Plaintiff to lose an opportunity to obtain, some undefined "better outcome." Defendant argues that Plaintiffs' evidence regarding a "better outcome" is too speculative to support a claim for damages. "The general rule is that remote, contingent, and speculative damages cannot be recovered in Michigan in a tort action." *Health Call of Detroit v. Atrium Home & Health Care Servs.*, 706 N.W.2d 843, 852 (Mich. Ct. App. 2005) (citing *Sutter v. Biggs*, 377 Mich. 80, 86, 139 N.W.2d 684 (1966)). As summarized by the Michigan Court of Appeals:

> Damages . . . are not speculative simply because they cannot be ascertained with mathematical precision. Although the result may only be an approximation, it is sufficient if a reasonable basis for computation exists. Moreover, the law will not demand that a plaintiff show a higher degree of certainty than the nature of the case permits. . . . Furthermore, the certainty requirement is relaxed where damages have been established but the amount of damages remains an open question.

*Health Call of Detroit v. Atrium Home & Health Care Servs.*, 706 N.W.2d 843, 852 (Mich. Ct. App. 2005) (internal citations omitted). Defendant compares Plaintiffs' evidence to that considered by the court in *Cripps v. Mecosta County General Hospital*, Nos. 262951, 262962, 2006 WL 448700 (Mich. Ct. App. Feb. 23, 2006), wherein:

> [P]laintiff's experts only offered statements that, in general, the earlier such a condition was treated, the better the result. To find for plaintiff based on this evidence, a jury would have to assume that because earlier treatment might have led

to a better result, it must have in this case. Such speculation and conjecture are insufficient . . . to establish that the injury was more probably than not caused by Dr. Hernandez's alleged act of negligence.

*Id.* at *1. As in *Cripps*, Dr. Kriegshauser initially testified that Plaintiff might have obtained a better outcome because "the sooner we treat infections generally the better the result." (Kriegshauser Dep. 68.) Unlike *Cripps*, however, he later testified that, *in Plaintiffs' case*, it was more probable than not that Plaintiff could have obtained a better result. (*Id.* at 69.) This testimony does not require a jury to assume that a "better outcome" could have been achieved in Plaintiff's case.

Nevertheless, Defendant is correct that Plaintiffs' evidence is too speculative because evidence of Plaintiff's inability or loss of opportunity to obtain a "better outcome" provides no basis for a jury to award damages. It is not at all clear what Plaintiffs' experts mean by a "better outcome," and Plaintiffs have not come forward with any explanation. Even at oral argument, Plaintiffs could not clarify what a "better outcome" would mean for Plaintiff. To award Plaintiffs damages, a jury would have to *assume* that a "better outcome" means less pain and suffering, greater mobility and use of her shoulder, fewer medical treatments, shorter recovery from surgery, or something else entirely. Even if a jury could reasonably conclude that Defendant's alleged negligence proximately caused some permanent damage to Plaintiff's shoulder,[6] there is no evidence indicating that this injury contributed to "pain

---

[6]Though not mentioned by either party, attached to Plaintiffs' complaint is an affidavit of merit signed by Dr. Kriegshauser which asserts that Defendant Peters's failure to meet the applicable standard of care was the "Proximate Cause of the injuries alleged in the Notice of Intent . . . leading to permanent damage" to Plaintiff's shoulder. (Compl. Ex. 1, Aff. of Merit ¶ 11.) The nonspecific statements in this affidavit are limited by Dr. Kriegshauser's specific deposition testimony that Plaintiff's shoulder had already sustained some permanent damage by
(continued...)

and suffering, disability and disfigurement, mental anguish, denial of social pleasure and enjoyments, . . . medical and hospital expenses . . . a permanent impairment of . . . earning capacity" or any other harm for which Plaintiffs seek relief. (Compl. ¶ 29.) Other than the testimony and affidavits of Dr. Kriegshauser and Dr. Harrison, Plaintiffs have not offered any evidence in support of causation or damages.

For the foregoing reasons, the Court finds that Plaintiffs have failed to offer evidence sufficient to raise a genuine issue of material fact that any alleged negligence on the part of Defendant was the proximate cause of any injury to Plaintiff resulting in damages. Therefore, the Court will grant Defendant's motion for summary judgment with respect to Plaintiff's medical malpractice claim. Plaintiffs also acknowledge that Plaintiff Bradley Kava's claim for loss of consortium is derivative of his wife's medical malpractice claim. *See Moss v. Pacquing*, 455 N.W.2d 339, 343 (Mich. Ct. App. 1990). Thus, Defendant Peters is also entitled to summary judgment on that claim.

Plaintiffs also move to amend their notice of intent to sue, but because the Court will grant summary judgment in favor of Defendant Peters, the Court will deny this request as moot.

An order will be entered that is consistent with this opinion.

Dated: September 3, 2009           /s/ Robert Holmes Bell
                                                          ROBERT HOLMES BELL
                                                          UNITED STATES DISTRICT JUDGE

---

[6](...continued)
the time she saw Plaintiff, and that he could not testify that "more likely than not" Plaintiff could have avoided shoulder replacement surgery.

14